# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AIR & LIQUID SYSTEMS CORPORATION; AMPCO-PITTSBURGH CORPORATION,<br><br>Plaintiffs,<br><br>vs.<br><br>UTICA MUTUAL INSURANCE COMPANY; NATIONAL INDEMNITY COMPANY; RESOLUTE MANAGEMENT, INC.,<br><br>Defendants. | Civil Action No. 12-1427 |

### DEFENDANT UTICA MUTUAL INSURANCE COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

John B. Cromer
BURNS WHITE, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212
(412) 995-3134

Walter J. Andrews
Michael S. Levine
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive
Suite 1700
McLean, VA 22102
(703) 714-7400

*Attorneys for Defendant,*
*Utica Mutual Insurance Co.*

**TABLE OF CONTENTS**

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

II. ARGUMENT ........................................................................................................................ 2

    A.  The Court Need Not Exercise Jurisdiction Over This Dispute ................................. 2

    B.  Plaintiffs Fail To Satisfy the Stringent Standards For Injunctive Relief .................... 3

        1.  Ampco Fails To Establish a Reasonable Probability of Success on the Merits ................................................................................ 4

            a)  Utica Continues To Serve In Its Role As Lead Carrier – There Has Been No Breach of Contract ........................... 4

            b)  Resolute's Appointment Does Not Violate the CIP's Anti-Assignment Provision .............................................................. 5

                (1)  The Anti-Assignment Provision Bars Only Total Assignments of The CIP ............................................... 5

                (2)  Resolute's Claims Handling Is Not a Total Assignment of Utica's Interest in the CIP ............................ 6

                (3)  Even If the Anti-Assignment Provision Bars Piecemeal Assignments, it Clearly Does Not Bar Utica's Appointment of Claims Handlers ..................... 6

                (4)  Even If Violated, A Breach of the Anti-Assignment Provision Only Subjects Utica To Damages Liability ............................................................... 7

            c)  The CIP Is Not a Personal-Services Contract; Delegation of Duties is Permissible Without Consent ....................... 8

        2.  Ampco Fails to Demonstrate Irreparable Harm ........................................... 9

        3.  Substantial Harm Will Occur if an Injunction Issues ................................ 12

        4.  The Requested Relief Will Directly Affect the Public Interest ................................................................................................... 13

        5.  An Award of Injunctive Relief Must be Accompanied by a Substantial Bond ........................................................................... 14

III. CONCLUSION .................................................................................................................. 15

Defendant Utica Mutual Insurance Company ("Utica"), through counsel, respectfully opposes Plaintiffs' request for a temporary restraining order and preliminary injunction in the above-captioned litigation and, in support thereof, state as follows.

I.     INTRODUCTION AND SUMMARY OF ARGUMENT

This dispute concerns an unjustified attempt by Plaintiffs, Air & Liquid Systems Corporation and its parent Ampco-Pittsburgh Corporation (collectively, "Ampco"), to interfere with and prevent Utica from fulfilling a properly negotiated, regulator-approved and fully consummated transaction with Defendants National Indemnity Company ("NICO") and Resolute Management, Inc. ("Resolute") ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ However, Ampco presents no cogent reason for its interference, which evidently is premised entirely on factual misunderstandings and outright fictions.

On September 28, 2012, Utica wrote to Ampco's representatives to inform them of a transaction that would operate to the mutual benefit of Utica and Ampco concerning the parties' previously negotiated agreement for the handling of certain asbestos-related bodily injury claims (the "CIP"). Declaration of Michael S. Levine ("Levine Decl.") Ex A.  On October 1, 2012, Ampco responded, accusing Utica of attempting to "assign the Agreement" and "withdraw[] as Lead Carrier."  Levine Decl. Ex. B.  On October 3, 2012, Utica responded to Ampco, explaining that Utica's relationship with Resolute does not involve an assignment under the CIP, that Utica fully intends to stand behind and honor its contractual obligations under all of its contracts for insurance and claims handling agreements with Ampco and that Utica has not withdrawn as Lead Carrier.  Levine Decl. Ex. C.  Finally, Utica invited Ampco to a meeting so that Utica could address any concerns that Ampco still might have concerning the arrangement with Resolute.  Id.  Without ever responding to Utica's explicit request for a meeting to discuss the transaction that is at the heart of this dispute, Ampco commenced this litigation the very same day without any clear understanding of what they so vehemently seek to undo.  See Verified Complaint [Docket No. 1].

As explained in detail below, Ampco's request for injunctive relief aimed at derailing Utica's arms-length business transaction with NICO and Resolute should be denied because:

- The parties expressly agreed that any disputes arising under the CIP would be resolved through arbitration ▊▊▊▊▊▊▊▊▊ an agreement that Ampco knows all-to-well given its three prior arbitrations with Utica under the CIP;

- Even if the Court were inclined to consider Ampco's request for extraordinary relief, Ampco fails to satisfy the stringent standards governing the award of injunctive relief;
  - Ampco cannot demonstrate any reasonable likelihood of success on the merits because Utica has not breached the CIP – it is still Lead Carrier and it has not "assigned" anything under the CIP;
  - Ampco fails to demonstrate any irreparable harm and, in fact, fails to demonstrate a potential for any harm at all; and
  - To the contrary, a substantial potential for harm to Utica, NICO, Resolute and the general public exists if an injunction is issued, since an injunction would thwart a ▊▊▊▊▊▊▊▊ transaction, directly affect those whose jobs have been reassigned in anticipation of the change of day-to-day claims handling from Utica to Resolute and ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊.

Accordingly, as explained in greater detail below, for each of these reasons, Ampco's request for injunctive relief should be denied.

## II.  ARGUMENT

### A. The Court Need Not Exercise Jurisdiction Over This Dispute

As a preliminary matter, and as Ampco forthrightly concedes, any and all controversies or claims arising under the CIP are to be resolved by arbitration administered by the American Arbitration Association ("AAA").  See Levine Decl. Ex. D at §XV.  And, consistent with that concession, Ampco itself commenced an arbitration proceeding.  See Plaintiffs' Brief in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Ampco Brief") at n.4.[1]

Under the applicable AAA commercial rules Utica must respond to Ampco's demand for arbitration by October 17, 2012 – one day after the date that the Court has set this matter for preliminary

---

[1] In fact, this dispute will be the fourth arbitration between Ampco and Utica under the CIP.  See Certification of Richard P. Creedon ("Creedon" Cert.") at ¶ 4.  Ampco, therefore, is fully cognizant of the parties' agreement to arbitrate – not litigate – disputes under the CIP.

hearing.  Shortly thereafter ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬  See Levine Decl. Ex. D at §XV ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

Likewise, nothing in the CIP carves out or otherwise suggests that the extraordinary relief sought by Ampco should be handled different from any other relief.  Indeed, by its own plain language, the CIP broadly requires tha ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ be resolved by arbitration.  Id. (emphasis added).  Ampco's request for extraordinary injunctive relief, therefore, also should be decided by the arbitrator.

Nevertheless, even if the Court is inclined to consider the Plaintiffs' request for extraordinary relief, as illustrated below, the Plaintiffs' request must fail because the Plaintiffs have failed to establish the necessary prerequisites for the relief sought.

### B.  Plaintiffs Fail To Satisfy the Stringent Standards For Injunctive Relief

Ampco seeks, without any factual basis, the extraordinary remedy of an injunction barring the fulfillment of a ▬▬▬▬▬▬▬▬▬ transaction among three corporate entities.  In doing so, however, Ampco fails to satisfy the requisite showings that must be made before extraordinary injunctive relief may be granted.

To obtain a TRO, this Court, like other federal courts in Pennsylvania, requires that a movant demonstrate:  (1) a likelihood of success on the merits; (2) the probability of irreparable harm if the relief is not granted; (3) that granting injunctive relief will not result in even greater harm to the other party; and (4) that granting relief will be in the public interest.  See Foskey v. Beard, 2007 WL 30217 (W.D. Pa. Jan. 7, 2007) (Conti, J.); see also Bieros v. Nicola, 857 F.Supp. 445 (E.D. Pa. 1994) ("to succeed under Rule 65(b), it must clearly appear from 'specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant.'"); see also Fed. R. Civ. P. 65(b) (1994).

The standards for a temporary restraining order are the same as those for a preliminary injunction. Friedberg v. Burns, No. CIV. A. 93–6626, 1993 WL 533361, at 3 (E.D. Pa. Dec. 16, 1993); Frank's GMC Truck Center, Inc. v. G.M.C., 847 F.2d 100, 102 (3rd Cir.1988); Ecri v. McGraw–Hill, Inc., 809 F.2d 223, 226 (3rd Cir.1987). Further, as this Court has recognized, a preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant presents clear proof that carries its burden of persuasion. See Jones v. Folino, 2008 WL 4610036, *1 (W.D. Pa. Oct. 15, 2008) (Conti, J.) ("a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

As shown below, Ampco fails to carry its heavy burden. Injunctive relief should be denied.

**1. Ampco Fails To Establish a Reasonable Probability of Success on the Merits**

The crux of Ampco's claim against Utica is that Utica somehow breached the CIP by assigning certain duties to NICO and, through NICO, to Resolute. See Verified Amended Compl. at ¶¶ 2, 3. Ampco's claim is two-fold: First, it contends that Utica improperly abrogated its role as Lead Carrier. In fact, it did not. Second, Ampco contend that Utica improperly "assigned" rights under the CIP. But, again, it did not. Thus, because Utica did not do what Ampco mistakenly thinks it did, there has been no breach of contract. Ampco, therefore, cannot demonstrate a reasonable likelihood of success on its breach of contract claim.

**a) Utica Continues To Serve In Its Role As Lead Carrier – There Has Been No Breach of Contract**

Central to Ampco's complaint is its mistaken belief that Utica somehow abdicated its role as Lead Carrier under the CIP. See Verified Amended Comp. at ¶¶2, 4; see also October 4, 2012 Tr. at 6:13-20 ("we filed the motion for temporary restraining order because we need to maintain the status quo with either Utica continuing in its traditional role for the past decade and serving as the lead carrier,

or, passing that baton under the structure provided for in the agreement to either Ampco-Pittsburgh or another insurer who is participating in the coverage-in-place agreement …")

However, Utica has done nothing to abdicate, affect or otherwise diminish its role as Lead Carrier under the CIP.  Indeed, under its agreements with NICO,    See Creedon Cert. at ¶ 6; see also Id. Levine Decl. Ex. E at §11.3(a), (c) ; id. Ex. F at §19.1 . See Levine Decl. Ex. D at §IV.A . See Creedon Cert. ¶ 9.

Given Utica's continued right to act as Lead Carrier under the CIP, there is no basis for Ampco's alleged breach of contract.  And, absent a basis for their claim, there cannot possibly be a reasonable likelihood of success on the merits.

### b) Resolute's Appointment Does Not Violate the CIP's Anti-Assignment Provision

Just as Utica has not abdicated or otherwise relinquished its role as Lead Carrier and its ultimate responsibility over asbestos-related claims being handled under the CIP, neither has Utica improperly "assigned" anything in contravention of the CIP's anti-assignment provision.

### (1) The Anti-Assignment Provision Bars Only Total Assignments of The CIP

The only reasonable construction of the anti-assignment provision requires that it be read to prohibit only to a *total* assignment of Utica's rights and obligations under the CIP.  Indeed, the plain meaning of the provisions' terms compel such a construction.  See Levine Decl. Ex. D at §XVI  (emphasis added).  "Agreement," which is expressly defined in the CIP, bolsters this construction.

Page 5

"Agreement" is defined to mean ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Id. at §I.A.  And, reading that definition into the anti-assignment provision, as must be done, makes clear that the anti-assignment provision pertains only to an assignment of the CIP as a whole.  See id.; see also Chen v. Chen, 893 A.2d 87, 93 (Pa. 2006) ("It is firmly settled that the intent of the parties to a written contract is contained in the writing itself.  When the words of a contract are clear and unambiguous, the meaning of the contract is ascertained from the contents alone"); Levine Decl. at B (acknowledging that the anti-assignment provision pertains to assignment of "the Agreement.")

### (2) Resolute's Claims Handling Is Not a Total Assignment of Utica's Interest in the CIP

But, an assignment of the CIP as a whole is not what occurred here and, it is not even what Ampco alleges.  Rather, Utica made a limited and definite arrangement to have Resolute ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ See McLaren v. AIG Domestic Claims, Inc., 853 F.Supp.2d 499, 511 (E.D. Pa. 2012).  For this reason as well, the anti-assignment provision is not applicable here.

### (3) Even If the Anti-Assignment Provision Bars Piecemeal Assignments, it Clearly Does Not Bar Utica's Appointment of Claims Handlers

Finally, even if the Court were to find that, contrary to the plain language of the anti-assignment provision, the provision applies to bar assignment of less than "the Agreement," the provision does not apply in this instance in any event because Utica merely appointed Resolute to serve as its claim handler.

Prior to September 28, 2012, Utica had total discretion to select or appoint employees of Utica or any of its subsidiary companies to handle claims under the CIP.  Levine Decl. Ex. 6.  And, nothing in the CIP restricted Utica's discretion, other than ordinary bounds of reasonableness.  Id.  Utica's appointment of Resolute, a highly qualified claims-handling entity, is no different.  Indeed, if Utica's

own claim handler had resigned and left the company, Utica would have been permitted and, in fact, required, to identify a suitable replacement. It should make no difference whether that replacement is a Utica employee, appointee, agent or sub-contractor. What matters is that the replacement is qualified to perform the job. Resolute certainly meets that criteria.[2]

### (4) Even If Violated, A Breach of the Anti-Assignment Provision Only Subjects Utica To Damages Liability

Moreover, under the law of this Circuit, even if the Court were to find that the anti-assignment provision applies, which it does not, and even if the Court were to find that the transaction amounts to an assignment in violation of that provision, which it does not, there still would be no basis for the Court to enjoin the transaction. See Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 442 (3d Cir. 1999) (finding violation of anti-assignment provision is nevertheless valid and merely subjects the assignor to damages liability). As the Third Circuit explained:

> [It is t]he general rule that contractual provisions limiting or prohibiting assignments operate only to limit a parties' right to assign the contract, but not their power to do so, unless the parties' manifest an intent to the contrary with specificity. To meet this standard the assignment provision must generally state that nonconforming assignments (i) shall be "void" or "invalid," or (ii) that the assignee shall acquire no rights or the nonassigning party shall not recognize any such assignment. In the absence of such language, the provision limiting or prohibiting assignments will be interpreted merely as a covenant not to assign, or to follow specific procedures-typically obtaining the non-assigning party's prior written consent-before assigning. **Breach of such a covenant may render the assigning party liable in damages to the non-assigning party. The**

---

[2] Additionally, under Pennsylvania law, an "assignment" is a transfer of property or a right from one entity to another and, unless qualified, it extinguishes the assignor's rights and transfers those rights to the assignee. Cecil Twp. Mun. Auth. v. N. Am. Specialty Sur. Co., 836 F. Supp. 2d 367 (W.D. Pa. 2011); see also Crawford Cent. Sch. Dist. v. Com., 585 Pa. 131, 136-37, 888 A.2d 616, 619-20 (2005) ("An assignment is a transfer of property or a right from one person to another; unless qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee.") citing Legal Capital, LLC. v. Medical Professional Liability Catastrophe Loss Fund, 750 A.2d 299, 302 (Pa. 2000); Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 924 (2d. Cir. 1977) ("It is true, of course, as a general rule, that when rights are assigned, the assignor's interest in the rights assigned comes to an end."). Accordingly, under the law of assignment, the assignee succeeds to the full envelope of rights that had been possessed by the assignor. Employers Insurance of Wausau v. Commonwealth, Department of Transportation, 865 A.2d 825, 830-31 (Pa. 2005) (citing Himes v. Cameron County Construction Corporation, 444 A.2d 98, 100 (Pa. 1982)). Accordingly, under Pennsylvania law, it cannot be said to be an assignment where the assignor – here, Utica – maintains some right to or control over the subject of the assignment, which it does by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Levine Decl. Ex. F at § 19.1.

**assignment, however, remains valid and enforceable** against both the assignor and the assignee.

Id. (emphasis added).

Accordingly, even if Ampco is correct in its argument that the transaction amounts to an improper assignment, that assignment still remains valid and enforceable and Ampco's only remedy is one of legal damages. And, it follows that because Ampco clearly would have an adequate remedy at law, an award of injunctive relief would be improper. See, e.g., Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 197 (3d Cir. 1990) (holding that existing equitable authority "does not mean that such an injunction is appropriate in a run-of-the-mill damages action," and instead, plaintiffs must demonstrate likely entitlement to damages and that "without the preliminary injunction, plaintiffs will probably be unable to recover those funds"); see also Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989) ("the availability of adequate monetary damages belies a claim of irreparable injury").

### c) The CIP Is Not a Personal-Services Contract; Delegation of Duties is Permissible Without Consent

In apparent recognition that the CIP's anti-assignment provision does not apply in this case, Ampco argues that Utica nevertheless should have obtained its consent because the claim-handling services contemplated under the CIP are "personal services" thereby requiring Ampco's consent before any change in identity of claims handler may occur. See Ampco Brief at 9. Once again, Ampco is wrong.

The CIP is not a personal services contract. In fact, claims-handling services are not even subject to the same analysis as personal services agreements. Under Pennsylvania law, a personal services contract is founded on an agreement to render uniquely personal skill or judgment. See, e.g., Blakely v. Sousa, 47 A. 286, 286-287 (Pa. 1900) ("Where distinctly personal services, requiring peculiar skill, are to be rendered by each of the contracting parties as inducements to the contract, there is mutuality, and the death of either of the parties is the death of the contract. In such a case, the personal

representative of the deceased cannot call upon the survivor to perform, and the latter cannot require the obligations to him to be assumed and discharged by another.")[3]

Presumably, Ampco's "personal services" argument is premised on the idea that Utica possesses some specialized knowledge about the handling of run-off asbestos bodily injury claims. However, Ampco fails to identify any specialized knowledge or skill. Rather, the extent of Ampco's suggestion that there is any special relationship between itself and Utica is confined to a single sentence containing a generic reference to the parties' "long-standing relationship and common-defense strategy." Ampco Brief at 5.

But, Ampco altogether ignores the fact that Resolute is an expert in the handling of asbestos-related bodily injury claims. Indeed, Resolute's business is the handling of run-off asbestos bodily injury claims. And, in fact ████████████████████████████████████████████ ████████████████████████████████ See Creedon Cert. ¶¶ 17, 18.[4]

**2. Ampco Fails to Demonstrate Irreparable Harm**

Without any detail, Ampco contends it has already suffered harm as a result of Utica's agreement to change the identity of the claims handler to NICO and Resolute. Ampco's naked contention is insufficient to support its request for injunctive relief. See ECRI v. McGraw-Hill, Inc.,

---

[3] Ampco's cases acknowledge that a contract for "personal services" contemplates performance of contracted-for duties involving the exercise of special knowledge, judgment, taste, skill, or ability. See e.g., In re Rooster, Inc., 100 B.R. 228, 232-34 (E.D. Pa. 1989) (refusing to find personal services contract despite the exercise of individual judgment and artistic taste). However, whether a contract is one for personal services depends upon the *sui generis* attributes of the intended performance. Id.; Matter of Noonan, 17 B.R. 793, 798 (S.D.N.Y. 1982); In re Compass Van & Storage Corp, 65 B.R. 1007, 1011 (E.D.N.Y. 1986). As the court explained in In re Rooster, Inc., contracts to perform "artistically" are clearly of a personal services nature. See In re Rooster, Inc., 100 B.R. at 232; citing Foster v. Callaghan & Co., 248 F. 944 (S.D.N.Y. 1918) (contract between author and publisher one for personal services); Matter of Noonan (contract for singer/songwriter to record one for personal services); Western Show Co. v. Mix, 162 A. 667 (Pa. 1932) (duty of Tom Mix to accompany a circus tour one for personal services). However, the CIP hardly can be argued to include an "artistic" or "creative" component.

[4] Furthermore, as the court concluded in In re Rooster, there are no other indicia present here of any agreement contemplating personal services, such as contractual terms requiring the personal performance of any identified employee for any particular duty. See In re Rooster, 100 B.R. 232 (explaining that without some indicia of how Rooster, Inc. was to perform its job that set it apart from any other entity, the court could not find that Rooster, Inc.'s work in selecting designs and materials for use in Bill Blass neckwear amounted to personal services.")

Page 9

809 F.2d 223, 226 (3d. Cir. 1987) (a movant must make a clear showing of identifiable and immediate irreparable injury to satisfy the requisite showing of irreparable harm).

Similarly, Ampco contends, without any specific facts or supporting documentation, that it will suffer irreparable harm in three ways. However, as noted above, such a vague and unsupported contention is not enough to establish the requisite irreparable injury. ECRI, 809 F.2d at 226. Nor is it enough for the harm to be serious or substantial; it must be so peculiar in nature that money cannot compensate for the harm. Id. Additionally, as this Court has recognized, "a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a clear showing of *immediate* irreparable harm." Foskey, 2007 WL 30217, *2, quoting Campbell Soup Co. v. Conagra, 977 F.2d 86, 91 (3d Cir. 1992) (emphasis in original); Adams v. Freedom Forge Corp., 204 F.3d 475, 488 (3d Cir. 2000) (harm may not be speculative).

Furthermore, irreparable harm means that the moving party will be injured in such a way that adequate compensatory or other corrective relief will not be available at a later date. Pierce v. Allegheny County Bd. of Elections, 324 F. Supp.2d 684, 706 (W.D. Pa. 2003) citing Oburn v. Shapp, 521 F.2d 142, 151 (3d Cir. 1975). But, as the Third Circuit has expressly recognized, parties that are subject to an improper contractual assignment, as the Plaintiffs contend they were here, should be compensated at law by an award of money damages. See Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 442 (3d Cir. 1999) (finding assignment in violation of anti-assignment provision to be valid while subject the assignor to liability for money damages).

Here, Ampco fails to demonstrate irreparable harm. First, Ampco contends that it will suffer irreparable harm because Utica's transaction will upset the long-standing relationship between Ampco and Utica. Ampco Brief at 10. But, Ampco does not explain how the relationship will be upset, particularly where Utica will still be Lead Carrier. Ampco's contention is, at most, speculative and indefinite.

Second, Ampco contends that Utica's change of the claim handling function to Resolute will result in a conflict of interest.  Id.  This, Ampco explains, is because Resolute has been handling an asbestos-related claim in which it has taken positions that are inconsistent with the positions Ampco will be taking in their defense of the claims that had previously been handled by Utica.  Levine Decl. Ex. H at 19-20.  But, as the Court already recognized, it is entirely common for insurance companies and claim-handling entities to handle claims that, on an individual level, may be antagonistic to one another. Oct. 4, 2012 Hearing Tr. at 15, 21.  Insurers address this routinely when, for example, an insurance company insures two individuals who bring litigation against each other – such as following a car crash.

Additionally, Ampco apparently forgets that even without the change to NICO and Resolute, Utica still is permitted and, in fact, required to exchange information with NICO as Utica's reinsurer on the asbestos-related bodily injury claims that are the subject of the CIP.  See Creedon Cert. ¶ 14.  And, as its reinsurer, Utica is obligated to periodically provide reporting to NICO about is underlying liability claims, even where those underlying claims might concern Ampco and even where Ampco might have separate pending litigation against NICO or its affiliates.  See id.  Never before becoming aware of Utica's transaction with NICO and Resolute, however, has Ampco expressed concern about Utica's reinsurance reporting or has Ampco ever complained about any harm that could somehow result from Utica's regular reinsurance reporting  See Creedon Cert. ¶ 15.

Furthermore, just as adequate safeguards permit Utica to safely fulfill its reinsurance reporting obligations, appropriate safeguards will be equally effective as Utica begins to share information with its claim-handling agent, Resolute.  Consequently, providing claim-related information to Resolute, as an agent of Utica, for purposes of handling the day-to-day aspects of Utica's asbestos claims, will be no different than Utica providing information to NICO through Utica's reinsurance reporting.  See North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1200-01 & 1212 (3d Cir. 1995) (explaining that, "because information regarding risks lies with the ceding insurer, the reinsurance market depends upon a high level of good faith to ensure prompt  and full disclosure); see also D&D Assocs. v. Bd. of

Page 11

Educ. of N. Plainfield, 2011 U.S. Dist. LEXIS 51853 (D.N.J. May 13, 2011) ("'Privileged persons,' include 'the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation'"); Maertin v. Armstrong World Indus., 172 F.R.D. 143, 151 (D.N.J. 1997) ("Rule 26(b)(3) of the Federal Rules of Civil Procedures defines a 'representative' expansively, permitting a 'consultant, surety, indemnitor, insurer, or agent' to assert the privilege.")

And, in fact, the protections afforded to Ampco with regard to Resolute are even greater. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ See Creedon Cert. ¶ 9. Thus, at a minimum, any exchange of information that would occur in connection with the change to Resolute would create no greater potential for harm than would otherwise exist under the ordinary operation of the CIP and, in fact, considerably less.

### 3. Substantial Harm Will Occur if an Injunction Issues

As noted by Ampco, the Court must balance the hardships to the respective parties as part of its determination of whether injunctive relief is appropriate. See Ampco Brief at 11, citing Opticians Ass'n v. Independent Opticians, 920 F.2d 187, 197 (3d Cir. 1990). The purpose of this balance is to ensure that any injunctive relief will not cause more harm than it might prevent. Id.

Here, Ampco contends that the relief sought is merely to maintain the status quo. Ampco Brief at 11. Ampco's contention implies that by staying the course, no harm could result. Ampco's simplistic implication is simply wrong.

At the heart of this litigation is a multi-party commercial transaction worth ▌▌▌▌▌▌▌▌▌ of dollars. Ampco would have that transaction stopped dead in its tracks. Doing so, however, would result in substantial financial losses to the parties involved, since it would entail, potentially undoing the deal and, at a minimum, rewriting it to embed different arrangements for the day-to-day handling of the asbestos-related claims that are supposed to be handled now by Resolute. See Creedon Cert. ¶¶ 22, 23. See also British Printing & Commc'n Corp. PLC v. Harcourt Brace Jovanich, Inc., 664 F.Supp 1519

(C.D.N.Y. 1987) (denying motion to enjoin corporate transaction because injunction would cause, among other things, loss of the benefit of the bargain.)

And, to compound the damage, Utica cannot now reassume control over the day-to-day handling of the claims because ███████████████████████████████████████████████████████████

███████████████████████████████████████████  In particular, as a direct consequence of its claim-handling transaction with NICO and Resolute, ███████████

████████████████████████████████████████████████████████████████

█████████████████ See Creedon Cert. ¶¶ 19, 20.  In addition, Utica has █████████████

████████████████████████████████████████████████████████████████

███████████████████████ Id.  Furthermore, if Utica were ordered █████████████

████████████████████████████████████████████████████████████████

██████████████████████████ to perform.  See Creedon Cert. ¶ 23; █████████

████████████████████████████████████

Conversely, at Resolute, personnel have been allocated for the handling of Ampco's claims as they are received from Utica.  Should the Court enjoin the transfer of those claims, personnel at Resolute who have been positioned for the handling of the Ampco's claims could be left without work. Id.

### 4. The Requested Relief Will Directly Affect the Public Interest

Finally, the Court must consider whether entry of an injunction will harm the public interest. See, e.g., Bieros, 857 F. Supp. at 445.  Ampco pays short shrift to this requisite for injunctive relief stating only that "contractual disputes generally do not implicate the public interest." Ampco Brief at 12.  In doing so, Ampco completely ignores the multiple ways an injunction will directly impact the public interest.

First, through its deal with NICO and Resolute, Utica has taken steps to ensure that each pending Ampco claim receives continued monitoring and attention so that, from a claim-handling

perspective, the transition of responsibility to Resolute is seamless.  See Creedon Cert. ¶ 11.  If enjoined, however, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████ to resume the day-to-day handling of Ampco's claims.

Second, if enjoined, a valuable commercial transaction will be halted and potentially undone.  Doing so will have a substantial impact on companies employing thousands of people in New York and Massachusetts – clearly a public interest.  See Creedon Cert. ¶ 22; see also Sanofi-Synthelabo v. Apotex Inc., 488 F.Supp.2d 317, 343 (S.D.N.Y. 2006) ("loss of consumer good will," "layoffs of employees," and suspension of business activity are evidence of irreparable harm).[5]

Third, if enjoined, personnel at Resolute who have been allocated for the handling of the Ampco's asbestos-related claims as those claims are received from Utica could find themselves without work.  This too, clearly would be a matter of public interest.

### 5. An Award of Injunctive Relief Must be Accompanied by a Substantial Bond

Finally, if the Court is to award Ampco the extraordinary relief it seeks, the Court also must require that Ampco post substantial security to protect Utica, NICO and Resolute from the harm that is likely to result.  Federal Rule of Civil Procedure 65(c), in relevant part, provides:

> Security.  The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

The Third Circuit has "interpreted the bond requirement very strictly."  Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 210 (3d Cir. 1990).  "[A]bsent circumstances where there is no risk of

---

[5] Significantly, New York State Department of Financial Services reviewed and approved the Utica/NICO deal, including the deal's operative agreements.  An injunction from this Court would run counter to that regulatory approval, which considered not only the impact of the operative agreements, but the impact of the deal on the finances of Utica.  Deference to such regulatory oversight and scrutiny should be afforded.  See New York Insurance Law § 1308(e)(3) (Insurance Commissioner must take into account interests of policyholders when considering transactions concerning the handling of policyholder claims).

monetary loss to the defendant, the failure of a district court to require a successful applicant to post a bond constitutes reversible error." Id.

The purpose of such security is profound. See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 805-06 n.9 (3d Cir. 1989). Indeed, as the Third Circuit has expressly recognized, improperly ordered relief "may harm the defendant and a bond provides a fund to use to compensate incorrectly enjoined defendants." Id. at 804.

Here, there is no basis for the extraordinary relief that Ampco seeks. Should the Court find otherwise, however and award Ampco the relief sought, Ampco should be ordered to post a bond as security sufficient to cover the parties' damages that will occur if this deal is undone. Ampco seeks to thwart a regulator-approved ███████████████████████████████████████

███████████████████████████████. If ordered, the measures that Ampco seeks to impose on Utica and Resolute have the potential for profound and lasting harm. A bond in an amount sufficient to protect against that harm is required. See Hoxworth, 903 F.2d at 189 (bond amount must be reasonably related to "the value of assets encumbered" by the order sought by plaintiffs); ██████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.

## III.   CONCLUSION

For the foregoing reasons, Utica respectfully requests that the Court deny Ampco's motion for a temporary restraining order.

Dated: October 9, 2012

Respectfully submitted,

/s/ John B. Cromer

John B. Cromer
BURNS WHITE, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212
(412) 995-3134

Walter J. Andrews
Michael S. Levine
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive
Suite 1700
McLean, VA 22102
(703) 714-7400

*Attorneys for Defendant,
Utica Mutual Insurance Co.*